| | |
|---|---|
| FAIRFIELD COUNTY MEDICAL ASSOCIATION, et al., Plaintiffs, | |
| v. | No. 3:13-cv-1621 (SRU) |
| UNITED HEALTHCARE OF NEW ENGLAND, et al., Defendants. | |

## RULING AND ORDER GRANTING PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

On November 15, 2013, plaintiffs Fairfield County Medical Association and Hartford County Medical Association, Inc.[1] (collectively "the Associations"), submitted their emergency motion for a temporary restraining order and preliminary injunction seeking to enjoin defendants United Healthcare of New England, Inc., United Healthcare Insurance Company, Inc., United HealthCare Services, Inc., and Unitedhealth Group, Inc. (collectively "United"), from implementing the termination of approximately 2,200 physicians from United's Medicare Advantage program. The Associations request an order (1) enjoining United from terminating any of the affected physicians from United's Medicare Advantage network; (2) enjoining United from notifying its Medicare Advantage customers that certain physician members will be terminated from the Medicare Advantage Network as of February 1, 2014; and (3) compelling United to reinstate, advertise, and market the affected physicians in their 2014 directories for the Medicare Advantage Network. Pls.' Emerg. Mot. TRO 1–2 (doc. 13).

---

1. Plaintiffs are membership organizations that assert associational standing to represent the concerns of their affected members. Compl. ¶ 1.

United responded to the Associations' motion, and I held oral argument on the merits of both interim remedies on December 3, 2013. Based upon a review of the entire record, the Associations' request for a preliminary injunction is GRANTED.

## I. Background

United is a health insurance provider that offers private coverage to elderly and disabled Medicare beneficiaries under the Medicare Part C[2] scheme provided in the Social Security Act, 42 U.S.C. §§ 1395w-21, *et seq.* Defs.' Mem. Opp'n TRO 5 (doc. 29). As the largest private Medicare insurer in Connecticut, United contracts with thousands of physicians to provide medical care for its Medicare Advantage[3] customers. Ashe Aff. ¶ 7 (doc. 29); Compl. ¶ 21 (doc. 1). The majority of Connecticut physicians who participate in United's Medicare Advantage plan do so through an "all products" agreement that governs physicians' service of customers across all of United's health insurance plans. Compl. ¶¶ 24–25. Although Medicare Advantage patients may visit "out-of-network" physicians without a referral, those patients often do so at a greater cost than if they utilized a United network physician.[4] Defs.' Mem. Opp'n TRO Ex. D, at 15 n.* ("The benefit level for non-emergency services from out-of-network physicians and other providers will generally be less than for services from network physicians and other providers.").

Around October 2 and October 31, 2013, United issued letters to more than 2,000

2. In its enacting legislation and regulations, this program is also referred to as "Medicare+Choice." 42 U.S.C. §§ 1395w-21, *et seq.*

3. United and CMS refer to Medicare Plan C programs as "Medicare Advantage." Defs.' Mem. Opp'n TRO Ex. D, at 15–16. Within the Medicare Advantage program, customers may choose to enroll in several different coverage plans. *Id.*

4. For certain Medicare Advantage plans, such as the Medicare Advantage PO and PPO plans, United offers partial coverage for non-emergency services obtained from out-of-network providers, and patients pay the difference in cost. Defs.' Mem. Opp'n TRO Ex. D, at 25. Patients enrolled in lower-cost plans, such as United's Medicare Advantage HMO, must notify United in advance of their intention to obtain non-emergency, out-of-network services, and they must also pay for the full cost of those services. *Id.* at 26.

physicians in Connecticut notifying those physicians that they would be removed from United's Medicare Advantage Network, effective February 1, 2014.[5] Compl. ¶ 5; Pls.' Mem. Supp. TRO 1 (doc. 20). United characterized these removals as an "amendment" to its contract with each provider. Compl. Ex. B, at 1 ("UnitedHealthcare is amending your Agreement . . . to discontinue your participation in the Medicare Advantage network . . . This Amendment does not require your signature.").[6] For purposes of triggering the terminated physicians' appeal rights, however, United described its removal of physicians from the Medicare Advantage plan as a "termination without cause." *Id.* at 2.

Shortly after issuance of the October 31, 2013 notices, the Associations filed this lawsuit, alleging United had denied the terminated physicians' substantive and procedural due process rights under the Medicare Act, 42 U.S.C. §§ 1305, *et seq.*, and United had breached the individual contracts with each terminated physician. Compl. ¶¶ 33–56 (doc. 1).

The Associations and United dispute the timing, adequacy of notice, and effective date of termination for physicians facing removal from the Medicare Advantage program. The Associations allege that United (1) unilaterally terminated service provider contracts with physicians enrolled in its Medicare Advantage program in October 2013, in violation of the Medicare Act, 42 U.S.C. §§ 1305, *et seq.*; (2) violated the substantive and procedural rights of affected physicians to appeal United's terminations; (3) failed to provide sufficient and proper notice to terminated physicians, rendering such notice invalid; and (4) breached the explicit

---

5.     United initially sent its termination notices by regular mail around October 2, 2013. Pls.' Mem. Supp. TRO 1 n.1 (doc. 20); Defs.' Mem. Opp'n TRO ¶ 4. On October 31, 2013, United rescinded and reissued its termination notices by certified mail. Pls.' Mem. Supp. TRO 1 n.1. The parties agree that the October 2 and October 31 letters are substantively identical. *Id.*; Defs.' Mem. Opp'n TRO ¶ 4.

6.     United refers to these agreements as "Physician Contracts." Defs.' Mem. Opp'n TRO Ex. C, at 2 (doc. 29).

terms of their contracts with physician providers, breached the implied covenant of good faith and fair dealing, and rendered its contracts with terminated physicians unenforceable through a failure to provide proper consideration. Compl. ¶¶ 33–56.

The parties primarily disagree about whether an insurance company providing Medicare Part C coverage may unilaterally remove, without cause or consent, any physician in its network. United asserts that it may amend its agreements with physicians to change a physician's participation in its different health plan products so long as it abides by the Medicare Act's regulations governing the notice and appeal rights of terminated physicians. Defs.' Mem. Opp'n TRO 6. The Associations argue that the plain language of United's Physician Contract and the language in United's termination notices should be characterized as terminations of the agreement, not as amendments, and that the terminations are subject to the timeline provided in the contracts' termination clause. Compl. ¶¶ 30, 34, 45–46.

The Physician Contract's amendment clause offers United broad discretion to unilaterally alter its agreements with physicians, allowing amendments to take place so long as United provides at least 90 days' notice. The effective date of an amendment is 90 days after a physician receives notice of the amendment and a copy of the amended agreement:

> We can amend this agreement or any of the appendices on 90 days written or electronic notice by sending you a copy of the amendment. Your signature is not required to make the amendment effective. However, if you do not wish to continue your participation with our network as changed by an amendment that is not required by law or regulation but that includes a material adverse change to this agreement, then you may terminate this agreement on 60 days written notice to us. . . .

Compl. Ex. A, at 4; Defs.' Mem. Opp'n TRO Ex. C, at 4.

The contract does not grant United the same discretion to terminate a physician without cause. In order to terminate an agreement without cause, United must provide written notice by certified mail to the terminated physician at least 90 days prior to the *anniversary date* of a

physician's agreement by certified mail. Compl. Ex. A, at 4; Defs.' Mem. Opp'n TRO Ex. C, at 4 ("[Y]ou or we can terminate this agreement, effective on an anniversary of the date this agreement begins, by providing at least 90 days prior written notice. . . . We both agree that termination notices under this agreement must be sent by certified mail, return receipt requested."). The termination clause limits the effective date of a termination without cause to the anniversary date of United's agreement with the physician being terminated. Compl. Ex. A, at 4; Defs.' Mem. Opp'n TRO Ex. C, at 4. Finally, the Medicare Act's regulations require that United provide an appeals process by which physicians can challenge their terminations with or without cause. 42 C.F.R. § 422.202(d).

## II.  Jurisdiction and Standing

United makes numerous arguments that this court lacks the authority to hear this case and that plaintiffs lack standing to bring these claims. Each of United's principal arguments is addressed below.

A. Subject Matter Jurisdiction

This court has subject matter jurisdiction to hear this dispute under 28 U.S.C. sections 1331 and 1367. The Associations assert two causes of action. The first cause of action alleges that United has failed to comply with the procedural requirements of the Medicare Act, 42 U.S.C. §§ 1305, *et seq.* The second cause of action alleges broadly that United has taken actions that constitute a material breach of contract under Connecticut common law. At the same time, United's standard contract with physicians states that, because the agreement implicates interstate commerce, it is subject to federal jurisdiction. Compl. Ex. A, at 5; Defs.' Mem. Opp'n TRO Ex. C, at 5. The court exercises original jurisdiction over the federal questions presented

under the Medicare Act, 28 U.S.C. § 1331, and it may exercise supplemental jurisdiction to hear the Associations' related state law claims, 28 U.S.C. § 1367.

United argues that, notwithstanding the fact that the Associations have brought claims based on federal law, federal question jurisdiction does not exist because the federal claims in this case lack merit. In short, United asserts that a federal district court must analyze whether federal claims will survive a motion to dismiss for failure to state a claim before it can exercise federal question jurisdiction. *See* Fed. R. Civ. P. 12(b)(6). That is simply not the law, and United provides no citation to suggest it is.

The "well-pleaded complaint" rule provides that a federal court has subject matter jurisdiction over a complaint that sets forth a federal claim on the face of the complaint. *Vaden v. Discover Bank*, 556 U.S. 49, 59–61 (2009); *Rivet v. Regions Bank of La.*, 522 U.S. 470, 475–76 (1998); *Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804, 808 (1986); *Franchise Tax Bd. v. Constr. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 9–10 (1983); *Bell v. Hood*, 327 U.S. 678, 681–83 (1946). In the event that the court grants a motion to dismiss all federal claims, it must then decide whether to dismiss the pendent state law claims pursuant to *United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966). Although arguments that the federal claims that provide subject matter jurisdiction are meritless may affect a court's analysis of the decision whether to issue injunctive relief, a merits analysis is not a precondition to the exercise of federal jurisdiction.

B. Standing and Ripeness

1. *The Associations Have Standing to Bring This Action*

Both associations have standing to bring this complaint under the Supreme Court's jurisprudence regarding associational standing. In *Hunt v. Washington State Apple Advertising*

*Commission*, 432 U.S. 333 (1977), the Supreme Court held that

> an association has standing to bring suit on behalf of its members when:
> (a) its members would otherwise have standing to sue in their own right;
> (b) the interests it seeks to protect are germane to the organization's
> purpose; and (c) neither the claim asserted nor the relief requested requires
> the participation of individual members in the lawsuit.

Id. at 343; *Rent Stabilization Ass'n v. Dinkins*, 5 F.3d 591, 596 (2d Cir. 1993).

The first prong of this test requires that the Associations' members have standing to bring

this action as individuals. To establish individual standing, a terminated physician would have to

demonstrate that (1) United's actions resulted in an "injury in fact—an invasion of a legally

protected interest which is (a) concrete and particularized, and (b) actual or imminent"; (2) that

there is a causal connection between United's actions and a physician's injury; and (3) that it is

likely that the physician's harm can be redressed by law. *Lujan v. Defenders of Wildlife*, 504

U.S. 555, 560–61 (1992) (internal citations and quotations omitted); *Green I. Power Auth. v.*

*Fed. Energy Regulatory Comm'n*, 577 F.3d 148, 159 (2d Cir. 2009).

The Associations have demonstrated that their individual members would have standing to

sue in their own right. Pinke Decl. (doc. 16); Hunt Decl. (doc. 17); Lapkin Decl. (doc. 18);

Forgione-Rubino Decl. (doc. 19). Through affidavits, the Associations have provided

information from affected members quantifying their future economic losses from termination,

expressing concern over the potential harm to their reputations, and describing the impact of

disruptions to their patient-physician relationships. In each of the declarations, the named

physicians articulate specific, individual, tangible, and quantifiable harm that they have

experienced or will experience as a result of United's termination decisions. Finally, the

physicians have offered evidence to show that they had entered into Physician Contracts with

United, that United may have breached these contracts by improperly terminating certain

physicians, and that the Medicare Act and common law govern the interpretation and

- 7 -

enforcement of these contracts. Additionally, the terminated physicians offer claims that are cognizable under the Medicare Act and under Connecticut's common law governing contracts. Both sources of law allow for the equitable remedies the physicians seek.

The second prong requires that this lawsuit further the purpose and mission of the Associations. Both Associations represent a wide array of physicians from multiple fields of medicine, in addition to medical students, interns, and residents. Compl. ¶¶ 1–2. Both Associations describe their missions as promoting and representing high-quality medical care, cultivating knowledge in the art and practice of medicine, working with the community to improve the health of all people, and developing sound public policy. *Id.* at ¶ 2. The Associations indicate that their mission-related interest in this litigation includes ensuring the continued success of all their (physician) members, as well as ensuring the vitality of the medical delivery system in their respective geographies. The Associations allege that, in addition to the direct harms its members experience from United's termination of its agreement with those members, the removal of over 2,000 physicians will increase the caseload of non-terminated physicians, resulting in strains on the system and potential overloading of non-terminated medical practices.

Finally, the Associations have raised cognizable legal rights and issues both under the regulations of the Medicare Act and under contract law for which equitable and legal remedies are available. United has asked me to impose new requirements to the Supreme Court's test for associational standing (Defs.' Mem. Opp'n TRO 8). I decline to do so. The Associations have met the established standard for asserting associational standing; no more is required of them.

2. *The Terminated Physicians are not Required to Exhaust a Federal Administrative Process Before Bringing the Instant Action.*

Neither the text of the Medicare Act, nor the Centers for Medicare and Medicaid Services'

("CMS") regulations, require that physicians exhaust any administrative processes prior to bringing an action to enforce a contract between a Medicare insurer and a physician/provider. Although Medicare has a sophisticated regime that requires administrative exhaustion for beneficiaries contesting claim coverage, CMS has not contemplated or issued regulations governing disputes between physicians and Medicare Plan C providers. 42 C.F.R. § 422.202(d). Because no administrative adjudication mechanism exists for the claims made in this case, plaintiffs have not failed to exhaust administrative remedies.

### 3. *The Associations' Terminated Members Must Submit to Individual Arbitration.*

The plain language of United's Physician Agreement requires that physicians avail themselves of the appeal process in United's Administrative Guide and then submit to binding, individual arbitration. Compl. Ex. A, at 5.[7] Nevertheless, United's arbitration requirement does not preclude this court from issuing an injunction in aid of arbitration. Ultimately the Associations are asking for time for their affected members to undergo a full appeal, arbitration, and review process prior to the termination of their Medicare Advantage provider agreements with United. The Federal Arbitration Act contemplates that federal courts may be required to review and enforce private agreements to arbitrate. 9 U.S.C. § 4; *Vaden*, 556 U.S. at 58, 60–61.

The Associations argue that the arbitration clause only governs disputes between United and its providers regarding reimbursement claims. The contract's plain language indicates that

---

7.   We will resolve all disputes between us by following the dispute procedures set out in our Administrative Guide. If either of us wishes to pursue the dispute beyond those procedures, they will submit the dispute to binding arbitration. . . within one year. We both expressly intend that any dispute between us be resolved on an individual basis so that no other dispute with any third party(ies) may be consolidated or joined with our dispute. . . Arbitration will be conducted in Hartford County, CT.

Physician Contract, at 5.

the dispute resolution section is meant broadly to control disputes regarding all sections of the contract. There are no contrary terms or limitations that suggest that the dispute resolution and arbitration sections are intended to be limited to disputes over claim coverage and payment. Thus, arbitration of the claims made here is required whether or not the status quo is preserved by injunction.

### C. Preemption

For the same reasons that the Associations and their members are not required to exhaust a federal administrative process with CMS when contesting their terminations, the Medicare Act does not preempt review of their terminations and their Physician Contracts. Although the Medicare Act explicitly preempts attempts by states to undermine or compete with Medicare as a health insurance scheme, it is silent on the issue of appeals regarding at-will termination or suspension of a physician without cause. 42 C.F.R. § 422.402 ("The standards established under this part supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) *with respect to the MA plans that are offered by MA organizations.*" (emphasis added)).

Instead, the Medicare Act requires that states do not interfere with the scope, implementation, or performance of Medicare plans offered by private organizations. It does not, however, preempt courts from reviewing agreements between physicians/providers and private Medicare plan providers to enforce the procedural rights set forth in those agreements and in the Medicare regulations governing physician termination. 42 C.F.R. § 422.202(d). Instead, the Medicare Act's procedural requirements for terminations of physicians without cause from Plan C programs should be read as providing a baseline level of procedural protection for physicians. These provisions are complementary to United's contracts with individual physicians, and they

do not supersede or displace stronger protections set forth in United's individual Physician Contracts.

### III. The Requests for Injunctive Relief

In the Second Circuit, the standard for issuance of a temporary restraining order ("TRO") is the same as the standard for a preliminary injunction. *UBS Fin. Servs. v. Junggren*, No. 11-cv-437(MRK), 2011 WL 1831587, *1 (D. Conn. Mar. 30, 2011), *citing Romag Fasteners, Inc. v. J.C. Penney, Inc.*, No. 07-cv-1667(JBA), 2007 WL 4225792, *2 (D. Conn. Nov. 28, 2007). "The fundamental purpose in granting preliminary injunctive relief has always been to preserve the court's ability to later render a meaningful final decision on the merits by preventing irreparable harm in the interim." *H&R Block E. Tax Servs., Inc. v. Brooks*, No. 00-cv-1332(JCH), 2000 WL 33124809, *2 (D. Conn. 2000).

A preliminary injunction is appropriate if a litigant demonstrates: "(1) that it will be irreparably harmed in the absence of an injunction, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits of the case to make them a fair ground for litigation, and a balance of hardships tipping decidedly in its favor." *Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 149 (2d Cir. 1999); *see also Mullins v. City of N.Y.*, 626 F.3d 47, 52–53 (2d Cir. 2010); *Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 510 (2d Cir. 2005); *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 142 (2d Cir. 1997).

When ruling on an application for a preliminary injunction or TRO, the courts have taken into account the following four factors: (1) the significance of the threat of irreparable harm to the plaintiff if the injunction is not granted; (2) the balance between the movant's alleged harm and the harm that granting the injunction would inflict on the opposing party; (3) the probability

that the plaintiff will succeed on the merits; and (4) whether a permanent injunction would disserve the public interest. *eBay v. MercExchange, LLC*, 547 U.S. 388, 391 (2006); *Minn. Mining & Mfg. Co. v. Francavilla*, 191 F. Supp. 2d 270, 277 (D. Conn. 2002).

A. Irreparable Harm

The Associations identify three categories of harm that they believe are irreparable and impossible to fully compensate with damages. The first harm is reputational, and it turns on the concern that patients will see a physician's removal from United's Medicare Advantage network as evidence of physician malpractice or unscrupulousness. The second harm is broadly related to consumer protection and focuses on consumer confusion over whether or not a specific physician will remain in-network and the impact of that information on a consumer's decision to enroll in United's Medicare Advantage program. The third harm focuses on (1) damage to long-standing trust relationships between patients and their physicians; and (2) the potential hardship for patients who require continuous care (e.g., patients with cancer, heart disease, diabetes) will experience in trying to identify new in-network physicians, resulting in a disruption of those patients' continuity of care and access to appropriate physician-providers/specialists. Based on the information in the record, I find that the Associations have met their burden of demonstrating that they will suffer harm that is imminent and cannot be adequately compensated through damages.

The Second Circuit has not ruled directly on whether disruption of the physician-patient relationship rises to a level in which equitable relief is appropriate. *Med. Soc'y of N.Y. v. Toia*, 560 F.2d 535 (2d Cir. 1977) (declining to address the issue of harm to the physician-patient relationship due to other standing considerations). Nevertheless, several district and circuit courts have found that disruption of the physician-patient relationship can cause irreparable harm that

justifies issuing preliminary injunctive relief, particularly when the patient belongs to a vulnerable class or may have a deep trust relationship with the physician because of the serious nature of the patient's illness or medical needs. *Schisler v. Heckler*, 574 F. Supp. 1538, 1552–53 (W.D.N.Y. 1983); *see also Roudachevski v. All-Amer. Care Ctrs., Inc.*, 648 F.3d 701, 706–07 (8th Cir. 2011). Other district courts have also found that dropping certain physicians from insurance plans, or altering elderly patients' access to specialists by terminating provider plans with those physicians, may cause irreparable harm and offend the public interest. *See, e.g.*, *Barron v. Vision Serv. Plan*, 575 F. Supp. 2d 825, 835–36 (N.D. Ohio 2008).

Moreover, courts have found that irreparable harm may exist when the moving party could suffer a loss of goodwill, suffer reputational harm, face exclusion from certain business opportunities, or face a significant threat to that party's business. *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970) (threat to business); *Rogers Group, Inc. v. City of Fayetteville, Ark.*, 629 F.3d 784 (8th Cir. 2010) (loss of goodwill); *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.2d 1149 (10th Cir. 2001) (loss of reputation and business opportunity); *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047 (5th Cir. 1997) (loss of reputation); *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546 (4th Cir. 1994) (permanent loss of customers due to the loss of goodwill); *Planned Parenthood of Minnesota, Inc. v. Citizens for Community Action*, 558 F.2d 861, 867 (8th Cir. 1977) (same).

Here, the Associations' members who are subject to the termination notices will suffer (1) disruption of their relationships with their Medicare Advantage patients, (2) loss of goodwill and reputational harm, and (3) a resulting loss of ability to compete in the market for provision of Medicare services. The disruption of physician-patient relationships results from the high cost of

medical care in this country and the structure of health insurance reimbursement plans that distinguish between in-network and out-of-network service providers. The terminated providers' patients could continue their existing relationships with the affected physicians only if they are able and willing to pay substantially greater sums to obtain those medical services. As another court has noted:

> It is unlikely that many patients would see a non-network [doctor] when they could see a network [doctor] for significantly less . . . .
>
> If [plaintiff], furthermore, were to prevail on his claim against [the insurer], it is unlikely that many of his former patients would return to him once he rejoined the network. In the meantime, most patients would have found other providers. Many, if not most, of these patients would probably not go through the additional effort of switching [doctors] for a second time in a short period. Even those who did consider returning might not as a result of the lawsuit's impact on [plaintiff's] reputation.

*Barron*, 575 F. Supp. 2d at 836.

The patients who received notices that their doctor(s) had been terminated from the Medicare Advantage Plan will naturally worry that the termination resulted from the doctor's poor professional performance or standing. Such harm is irreparable.

Finally, the combination of (1) the reduction in the number of patients who can receive in-network services from an affected provider, and (2) the reputational harm that attends termination from a plan, will result in an irreparable loss in the ability to compete in the market for Medicare services. This harm is magnified because United is far and away the largest Medicare insurance provider in Connecticut. Loss of United's Medicare insureds translates to both a larger loss of market share and a broader reputational harm to affected doctors than would termination from a smaller plan.

B. Likelihood of Success on the Merits

The Associations have demonstrated a likelihood of success on the merits of their contract-based claims. United's argument that it has a unilateral right to terminate participating physicians from participation in the Medicare Advantage plan by "amendment" of that plan is not supported by the language of the contract or the parties' experience under it.

United and the participating physicians entered into a contract that consists of a general network participation agreement plus a series of appendices and other materials.[8] That contractual structure allows the parties to set forth in the Physician Contract the basic obligations to each other that are independent of participation in a specific plan; e.g., maintaining medical credentials, submitting claims only for services rendered, promptly adjudicating claims for covered services, terminating the agreement, and arbitrating disputes. The plans that a particular doctor participates in are listed in Appendix 2, and specific plan-related terms are set forth in other appendices. Defs.' Mem. Opp'n TRO Ex. C, at 10 (doc. 29). The terms of the agreement between participating doctors and United with respect to the Medicare Advantage plan are set forth in the Medicare Advantage Regulatory Requirements Appendix ("Medicare Appendix"). *Id.* at 20. With limited exceptions, in the event of a conflict between the Physician Contract and the Medicare Appendix, "the provisions of [the Medicare] Appendix shall control." *Id.* (Medicare App'x § 1).

United's "amendment" to Appendix 2, which removed the Medicare Advantage plan from the list of plans in which particular physicians participated, had the effect of terminating those physicians from the network plan through which United provided Medicare benefits. The "amendment" terminated all rights the physician had under the Medicare Appendix; i.e., the

---

8.  As noted above, United refers to its network participation agreement as a "Physician Contract," Defs.' Mem. Opp'n TRO Ex. C, at 2 (doc. 29), and it also uses the term "network participation agreement" in its Medicare Advantage Appendix. *Id.* at 20.

agreement governing the physician's participation in the Medicare Advantage plan. The fact that a particular physician continued to participate in other United plans that do not provide Medicare benefits does not transform that termination into something less than a termination of participation in a Medicare services plan. Medicare regulations require that a Medicare Advantage insurer operating a "coordinated care plan or network MSA [medical savings account] plan providing benefits through contracting providers" meet certain requirements. 42 C.F.R. § 422.4. Thus, when United "suspends or terminates an agreement under which the physician provides services to MA [Medicare Advantage] plan enrollees," 42 C.F.R. § 422.202(d)(1), it is required to provide written notice of the "reasons for the action, including, if relevant, the standards and profiling data used to evaluate the physician and the number and mix of physicians needed by the MA organization." *Id.* § 422.202(d)(1)(i). That did not occur here, in apparent breach of both Medicare regulations and the Physician Contract provisions regarding termination ("either you or we can terminate this agreement, effective on an anniversary of the date this agreement begins, by providing at least 90 days prior written notice."). 42 C.F.R. § 422.202(d); Compl. Ex. A, at 5; Defs.' Mem. Opp'n TRO Ex. C, at 5.

At oral argument, United suggested that it routinely amends Appendix 2 without the consent of participating physicians as a way of removing physicians from participation in a particular plan. If true, that assertion would support United's interpretation of its rights under the agreement by demonstrating how the parties themselves had interpreted the agreement in practice. I therefore requested that United provide evidence or affidavits showing that in Connecticut it had used the amendment of Appendix 2 to unilaterally remove a physician from participation in its Medicare Advantage plan without cause and without the physician's consent. The evidence provided in response to my request does not support United's assertion. Although

United apparently has *added* Connecticut physicians to a plan by amendment, Hayhurst Suppl. Decl. ¶ 5 (doc. 43), it has not terminated Connecticut physicians in that way.

Accordingly, I conclude that, at a minimum, the plaintiffs are likely to prevail on their breach of contract claims.[9]

## IV.   Conclusion

For the foregoing reasons, the Associations have met their burden of proving irreparable harm and a likelihood of success on the merits that United breached the terms of its Physician Contract with the Associations' member physicians. Therefore, a preliminary injunction to prevent the removal of affected physicians from United's Medicare Advantage network in violation of United's Physician Contract is necessary pending determination of the merits of the Associations' claims.[10] Accordingly, the motion for preliminary injunction (doc. 13) is **GRANTED.**

---

9.   Having found that the Associations are likely to prevail on the merits of their contract claims, I need not balance the respective hardships in this case. Nonetheless, in the alternative, I find that a balancing of hardships also would favor the Associations. In order to balance hardships, the court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 9–10 (2008); *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987); *N.Y. Progress & Protection PAC v. Walsh*, 733 F.3d 483, 488–89 (2d Cir. 2013). United has not offered evidence of injury from the granting of a preliminary injunction, and instead, has discussed the costs it may incur attempting to arbitrate appeals from terminated physicians under its Physician Contract. The failure to grant injunctive relief, in contrast, would cause the Associations' members irreparable harm.

10. The request for entry of a TRO is denied as moot.

## PRELIMINARY INJUNCTION ORDER

Pursuant to Rule 65 of the Federal Rules of Civil Procedure:

**IT IS ORDERED** that the defendants, United Healthcare of New England, Inc., United Healthcare Insurance Company, Inc., United HealthCare Services, Inc., and Unitedhealth Group, Inc., and their agents, officers, directors, trustees, employees, and anyone acting in concert with them who receives actual notice of this order, are hereby restrained, enjoined, and prohibited from:

(a) terminating any of the Associations' physician-members from United's Medicare Advantage network;

(b) notifying their Medicare Advantage customers/insureds that certain providers will be terminated from the Medicare Advantage Network as of February 1, 2014; and

(c) removing or failing to advertise/market the Associations' affected physicians in United's 2014 directories for the Medicare Advantage Network.

This order shall not prevent the termination or non-renewal of a physician-member from United's Medicare Advantage network following United's compliance with the effective termination date, appeal, and arbitration provisions governing terminations without cause, as set forth on page 5 ("What if we do not agree") of its Physician Contract.

Within forty-eight (48) hours of the entry of this Order, the plaintiffs, Fairfield County Medical Association and Hartford County Medical Association, Inc., shall provide a list of their members to United to permit United to comply with this order.

The Associations are not required to give a security pursuant to Rule 65(c).

The preliminary injunction shall remain in effect until a ruling on the merits of the Associations' claims or a further order of this court.

It is so ordered.

Dated at Bridgeport, Connecticut, this 5th day of December 2013.

Stefan R. Underhill
United States District Judge